2006-NMCA-140

147 P.3d 885

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Paul STOCK, Defendant–Appellee.**

**No. 26,148.**

Court of Appeals of New Mexico.

Sept. 29, 2006.

Certiorari Granted, No. 30,069, Nov. 16, 2006.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Ralph E. Trujillo, Assistant Attorney General, Albuquerque, NM, for Appellant.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} This case raises the difficult question of whether a defendant's constitutional right to a speedy trial is violated when he is incarcerated and awaiting trial for more than three years, but the delay is in part attributable to the neglect of his overworked public defenders. We hold that, under the egregious facts of this particular case, the defendant's speedy trial rights were violated. Accordingly, we affirm the district court's dismissal of all the charges against the defendant.

## BACKGROUND

{2} Defendant Paul Stock was indicted on numerous counts of criminal sexual penetration of a minor and other charges on August 17, 2000. Defendant was arraigned on September 25, 2000. Trial was initially set for March 6, 2001. On February 19, 2001, defense counsel requested an extension of time. The State filed a motion to extend the six-month rule, noting that the reason for the motion was Defendant's request for a continuance, and the district court granted the extension. See Rule 5–604 NMRA. On April 27, 2001, the district court granted Defendant's motion for a forensic evaluation to determine whether Defendant was competent to stand trial. The order stated that the six-month rule would be tolled pending the evaluation. A status conference was held on May 14, 2001, during which the district court was reminded that Defendant's competency needed to be evaluated.

{3} It appears that the forensic examiner issued a report on August 29, 2001, finding Defendant competent to stand trial. The State asserts that the record does not reveal who received this report, and it appears that neither the State nor the district court received the report at this time. On April 1, 2002, nearly a year after the last status conference, the State requested a status conference regarding competency. A conference was held on May 6, 2002, at which defense counsel stated that Defendant had been found competent to stand trial. At this conference, however, defense counsel continued to question Defendant's competency and requested another continuance for the purpose of having Defendant evaluated by a second expert. The court granted the continuance and stated that the next hearing would be at Defendant's request. There is no indication in the record that the court actually ordered another evaluation.

{4} The record shows that no further activity occurred in the case for nearly a year and a half until October 9, 2003, when defense counsel filed a request for a status conference. It appears that a second competency evaluation had been completed and sent to defense counsel on November 20, 2002, but once again, there is no indication that this report, or any notification that an evaluation had been completed, was sent to the State or the district court. This report was equivocal regarding Defendant's competency, stating, "Individuals with [Defendant's] intellectual capacity are sometimes competent but often are incompetent.... As this issue remains unclear[,] it may take fur-

ther assessment of [Defendant] to be more definitive."

{5} A status conference was held on October 27, 2003, at which defense counsel stated that the first expert had found Defendant competent, but the second expert had issued an ambiguous report. Defense counsel and the State both reported that there were ongoing plea negotiations regarding a plea of guilty but mentally ill. The State represented that an additional evaluation would be necessary for such a plea and requested that the court order the required evaluation. The court apparently agreed with this request, but the record does not show an order for evaluation. At the October 2003 hearing, the court also set a trial date of January 6, 2004, in case the plea negotiations were not successful.

{6} A pretrial conference was held on November 3, 2003, at which the court found Defendant competent. On December 4, 2003, the court issued a "Competency Order Nunc Pro Tunc," stating that Defendant was competent to stand trial.

{7} Another pretrial conference was held on December 1, 2003. At this conference, it appears that both the State and defense counsel reported that plea negotiations were still ongoing and that another evaluation would be needed. On December 8, 2003, the court ordered another evaluation, stating that the six-month rule was tolled. The court held three more status conferences on January 12, 2004, February 2, 2004, and February 6, 2004. As of at least February 2, 2004, the additional competency evaluation had not been completed. Ruling that Defendant's speedy trial rights had been violated, the court sua sponte dismissed all charges against Defendant and ordered that he be released from custody. The court also appointed a guardian ad litem for Defendant. The State appealed the order of dismissal. In an unpublished memorandum opinion, this Court reversed and remanded in order for the district court to hold an evidentiary hearing.

{8} Defendant filed a motion to dismiss in the district court on June 20, 2005. The court held an evidentiary hearing on August 23, 2005. All three of Defendant's public defenders testified. They all stated that, at the time they worked on Defendant's case, they were operating under extremely heavy caseloads, ranging from 200 to 300 cases each for his attorneys and 75 to 100 cases for the district defender, who also had administrative duties. Two of the attorneys stated that they did not have the resources to both pursue the issue of Defendant's competency and investigate the merits of the case and that, having to choose between these two avenues, they decided to pursue competency only. Defense counsel presented evidence of numerous instances of Defendant being attacked in jail and numerous requests for Defendant to be placed in administrative segregation for his own safety.

{9} The State acknowledged that the delay in bringing Defendant to trial was presumptively prejudicial. The State noted that while defense counsel had "dropped the ball," all of the delay was for the purpose of determining Defendant's competency and was thus for his benefit. The State also argued that there was no actual prejudice because all of the witnesses were still available and there was no evidence that their memories had been tainted. When asked by the court whether the State had some obligation to move the case along rather than just "sit[ting] on your hands," the prosecutor acknowledged that at least "personally," she felt there was such an obligation.

{10} At the close of the hearing, the district court once again dismissed the charges. The court found that, while all of the public defenders who worked on Defendant's case were competent and ethical, it was "humanly impossible for lawyers to practice law under the conditions that we're asking them to practice law." The court stated that the case showed "the need for the legislature, and the governor, and the people of this state to wake up and start properly funding not only the public defenders' office but also the district attorneys' offices," because otherwise courts would have to continue dismissing cases that were not timely prosecuted.

{11} The court also found that there had been no intentional strategy of delay on the part of defense counsel, and that the State

had an obligation to monitor the case and keep it moving. The court expressed concern that it appeared that Defendant had agreed to the various continuances, but the court questioned such acquiescence in view of the fact that Defendant was found to have the intellectual functioning of a twelve-year-old. The court also noted that even if Defendant had wanted to express his frustration about the delays, he could not have done so because he often was not transported to court for hearings. Finally, the court found that the delay had prejudiced Defendant. The court noted that there was documentation of Defendant being attacked in jail on numerous occasions. The court further noted that (1) it had been five years since the alleged incident, (2) the alleged victim had never been interviewed by defense counsel, and (3) any physical examination would now be useless or of limited value. The State appeals the dismissal.

## DISCUSSION

**{12}** We recently set forth the framework under which we analyze a speedy trial claim:

The right to a speedy trial is protected by the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, and Article II, Section 14 of our state constitution. The right attaches when the defendant becomes an accused, either at the time of arrest or upon the issuance of an indictment or information. When a speedy trial claim is made, the defendant must make a threshold showing that the length of delay is presumptively prejudicial. Once that showing has been made, the burden of persuasion shifts to the State to show, on balance, that the four factors do not weigh in favor of dismissal. Courts balance four factors to determine whether a speedy trial violation has occurred. The factors to be considered are: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. On appeal from a speedy trial claim, we [defer] to the district court's fact finding, [but] independently examine the [four factors] to ensure that no violation has occurred.

*State v. Laney*, 2003–NMCA–144, ¶ 10, 134 N.M. 648, 81 P.3d 591 (alterations in original) (internal quotation marks and citations omitted). In balancing the four factors referenced above, no factor is necessary or dispositive: "[N]one of [the factors] has any 'talismanic quality,' and each can be assigned different significance or different weight in the 'difficult and sensitive balancing process' that must take place[.]" *Work v. State*, 111 N.M. 145, 147–48, 803 P.2d 234, 236–37 (1990) (quoting *Barker v. Wingo*, 407 U.S. 514, 533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

### 1. Length of Delay

**{13}** The length of delay factor serves a dual role. First, it is a threshold inquiry that triggers the rest of the analysis, and second, it is considered as part of the balancing test itself. *See Laney*, 2003–NMCA–144, ¶ 11, 134 N.M. 648, 81 P.3d 591. In determining the weight to be given to the length of the delay, we consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

**{14}** Where a case is simple and relatively easy to prosecute, delay will weigh more heavily against the State because there is less excuse for delay. *See Barker*, 407 U.S. at 531, 92 S.Ct. 2182 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."); *State v. Marquez*, 2001–NMCA–062, ¶ 12, 130 N.M. 651, 29 P.3d 1052 (weighing an eighteen-month delay heavily against the state because the case was a simple DUI matter and the delay had stretched far beyond the period required to trigger judicial examination).

**{15}** In this case, Defendant was arraigned on September 25, 2000, and was ordered released from custody on February 11, 2004. The State acknowledges that this delay of nearly three and one-half years is presumptively prejudicial, triggering an analysis of all of the factors. Moreover, the parties appear to agree that this was a simple case. The State planned to rely on eye-

witness testimony of the alleged victim and the testimony of her parents, as well as Defendant's confession. The State estimated that the case would take two or three days to try. In view of the lengthy delay and the apparent lack of complexity of the case, we think this factor weighs in Defendant's favor.

{16} While the reason for delay is not relevant to the initial step of determining whether there is a presumption of prejudice that triggers analysis of all the *Barker* factors, *State v. Urban*, 2004–NMSC–007, ¶ 13, 135 N.M. 279, 87 P.3d 1061, it would seem to make sense to consider the reason for delay in deciding what weight to assign to the length of delay. However, our cases have not seemed to proceed in this manner. *See, e.g., State v. Plouse*, 2003–NMCA–048, ¶¶ 43–47, 133 N.M. 495, 64 P.3d 522 (analyzing the length of delay and finding it to weigh in the defendant's favor, only to then determine that the delays were all caused by the defendant and that the second factor thus did not weigh in his favor); *Marquez*, 2001–NMCA–062, ¶¶ 12–20, 130 N.M. 651, 29 P.3d 1052 (analyzing the two factors separately; first holding that eighteen-month delay weighed heavily against the state but then determining that five of those eighteen months were neither side's fault); *State v. Manes*, 112 N.M. 161, 168–69, 812 P.2d 1309, 1316–17 (Ct.App.1991) (weighing delay in favor of the defendant even though most of the delay was for a valid reason and thus the "reason for delay" factor weighed only "slightly" against the state).

{17} Perhaps the methodology of these cases reflects the fact that, even where a defendant bears some responsibility for delay, the sheer fact of lengthy incarceration or other restraint on liberty should count for something in the speedy trial analysis. This makes sense, because it is ultimately the State's responsibility to bring a defendant to trial in a timely manner. *See Marquez*, 2001–NMCA–062, ¶ 8, 130 N.M. 651, 29 P.3d 1052 ("It is primarily the responsibility of the State to bring a case to trial within a reasonable period of time."); *Barker*, 407 U.S. at 527, 92 S.Ct. 2182 ("A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the

trial is consistent with due process." (footnotes omitted)). Moreover, a lengthy delay, regardless of the party to whom the delay is technically attributable, can cause prejudice to a defendant. *Cf. Doggett*, 505 U.S. at 652, 112 S.Ct. 2686 ("[T]he presumption that pretrial delay has prejudiced the accused intensifies over time.").

{18} In any event, the three and one-half year delay in this case was particularly egregious. *See State v. Lujan*, 2003–NMCA–087, ¶¶ 5–6, 134 N.M. 24, 71 P.3d 1286 (holding a delay of nearly three years in a simple case to weigh heavily against the state); *State v. Talamante*, 2003–NMCA–135, ¶¶ 1, 21, 134 N.M. 539, 80 P.3d 476 (holding that a delay of thirty-one months in an intermediate or complex case weighed heavily in favor of the defendant); *State v. Lujan*, 112 N.M. 346, 348, 815 P.2d 642, 644 (Ct.App.1991) (holding a thirteen-month delay to be "relatively lengthy" in a simple case). Accordingly, we hold that the delay weighs heavily in Defendant's favor.

## 2. Reasons for Delay

{19} The State argues that Defendant's speedy trial claim must fail because the majority of the delay was occasioned by Defendant's repeated requests for continuances for the purposes of competency evaluations. We do not quarrel with the State's assertion that delays caused by competency evaluations should generally not count against the state for speedy trial purposes because the state cannot try an incompetent defendant. *See State v. Mendoza*, 108 N.M. 446, 449–50, 774 P.2d 440, 443–44 (1989) (holding that where delays were due to competency evaluations, they were "for [the defendant's] benefit" and the defendant was responsible for them), *modified on other grounds as recognized in State v. Lobato*, 2006–NMCA–051, ¶ 28, 139 N.M. 431, 134 P.3d 122. This general rule makes sense because to the extent delays are for a defendant's benefit, it would not be fair to hold them against the state. However, in this particular case, we cannot disagree with the district court's conclusion that both parties bear some responsibility for the delay.

{20} We examine the period from May 2001 to October 2003, which constitutes more than two-thirds of the total delay in this case, to demonstrate the nearly complete lack of attention to the case on the part of both the State and defense counsel. On May 14, 2001, a status conference was held, at which the district court was informed that defense counsel was having Defendant examined for competency pursuant to the court's previous order. It appears that the expert completed her evaluation, finding Defendant competent, on August 29, 2001. However, this report was not sent to the State or to the court, and its completion was not disclosed until over eight months later, during the May 6, 2006, status conference requested by the State. The status conference was held on May 6, 2002. At the conference, defense counsel reported that one expert had found Defendant competent, but counsel asked for a continuance to have Defendant reevaluated by another expert. It appears from the record that defense counsel received a report from the second expert in November 2002. However, defense counsel never sent this report to the State or to the court and in fact did absolutely nothing to move the case forward for nearly a year, when counsel finally requested another status conference in October 2003. Thus, for nearly two and one-half years, nothing happened in the case, with the exception of two competency evaluations (the results of which were not disclosed to anyone but defense counsel), and one status conference.

{21} We simply cannot see how these unreasonable and unnecessary delays can be considered to have been "for [Defendant's] benefit." *See Mendoza*, 108 N.M. at 449, 774 P.2d at 443. We certainly do not mean to say that a defendant should not bear the burden of a delay unless he or she *actually* benefited from it. It seems unfair, however, to attribute delays to Defendant when the delays are solely attributable to his counsel and, given their completely unnecessary length, cannot objectively be said to have been "for his benefit." In other words, while we would agree with the general proposition that competency evaluations are for a defendant's benefit, we cannot agree that needlessly taking one and a half years to communicate the results of such evaluations is for a defendant's benefit.

{22} Indeed, we think it noteworthy that there is no indication that Defendant himself ever asked for or expressly consented on the record to any of the delays in this case. While we agree with the general rule that a defendant must be held accountable for the actions of his or her attorneys, we have previously indicated in dicta that there could be a case where delays caused by the neglect of court-appointed counsel cannot be held against a defendant for speedy trial purposes. *See Plouse*, 2003–NMCA–048, ¶¶ 46–47, 133 N.M. 495, 64 P.3d 522 (rejecting as unsupported by the record the defendant's claims that he did not agree to continuances and that delays were partly due to the incompetence of his attorneys, but stating that "[w]e are unwilling, without considerably more evidence in the record of the attorneys' behavior and the State's knowledge of such behavior, to relieve Defendant of the burden of continuances requested or caused by his own attorneys"). We think this is such a case.

{23} We agree with the following pronouncement made by the Supreme Court of Illinois in a case involving an attorney's failure to prosecute an appeal:

> For a representative system of litigation to function, it is self-evident that under most circumstances clients must be bound by the acts of their lawyers. However, it is equally self-evident that a mechanical application of this legal proposition can lead to harsh results repugnant to commonly held notions of justice and fair play. These results can be even harsher in a criminal case than a civil one since in the latter suit the aggrieved client has, in theory, a malpractice action against his attorney for damages, while in the former no attorney can restore his client's lost liberty.

*People v. Brown*, 39 Ill.2d 307, 235 N.E.2d 562, 565 (1968) (citation omitted).

{24} Here, nothing can restore to Defendant the three-and-one-half years that he spent in jail awaiting trial while his counsel did very little to move the case forward. We

are unwilling to reverse the district court's ruling that Defendant's speedy trial rights were violated just because much of the delay is perhaps technically attributable to his counsel.

{25} Moreover, we agree with the district court that the extraordinary delay in this case is partially attributable to the State. It is ultimately the state's duty to make sure that defendants are brought to trial in a timely manner. *See Barker,* 407 U.S. at 527, 92 S.Ct. 2182 ("A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." (footnotes omitted)); *Marquez,* 2001–NMCA–062, ¶ 8, 130 N.M. 651, 29 P.3d 1052 ("It is primarily the responsibility of the State to bring a case to trial within a reasonable period of time."). Throughout this case, the State did little or nothing to ascertain what was happening in the case or to move the case forward. We think the State had a duty to do so. *See Laney,* 2003–NMCA–144, ¶ 17, 134 N.M. 648, 81 P.3d 591 (noting that the state has a "constitutional duty to make a diligent, good-faith effort to bring a defendant to trial" (internal quotation marks and citation omitted)); *see also Middlebrook v. State,* 802 A.2d 268, 272, 274–75 (Del.2002) (finding a speedy trial violation based on a delay of three years and eight months and holding the trial court and the state responsible for the delay, even though nine and a half months of delay was caused by defense counsel's requests for continuances to go on vacation; noting that "the State and the trial court did not oppose the delay [due to the vacations] despite the prolonged pendency of [the defendant's] charges"). Indeed, we think the State's inaction in this case can be characterized as "bureaucratic indifference," which we have held to weigh against the state more heavily than mere negligence. *See Laney,* 2003–NMCA–144, ¶ 17, 134 N.M. 648, 81 P.3d 591.

{26} Finally, we note that the district court was emphatic that Defendant's counsel did not commit any intentional misconduct in this case. Rather, the district court blamed the delay on the fact that the public defenders' office was severely overbur-

dened. As we have noted, the district court was of the view that it was "humanly impossible for lawyers to practice law under the conditions that we're asking them to practice law." To the extent that delays can be blamed on the overburdened system, that also cannot be held against Defendant. *Cf. People v. Johnson,* 26 Cal.3d 557, 162 Cal. Rptr. 431, 606 P.2d 738, 741, 747 (1980) (in bank) (holding that counsel cannot waive a defendant's statutory speedy trial rights over the defendant's objection where counsel does so due to time constraints and not to promote the client's best interests and noting that "[t]he right [to a speedy trial] may also be denied by failure to provide enough public defenders or appointed counsel, so that an indigent must choose between the right to a speedy trial and the right to representation by competent counsel").

{27} Our holding is also supported by cases involving appellate delay. *See Harris v. Champion,* 15 F.3d 1538, 1562 (10th Cir. 1994) (addressing systemic delays in the Oklahoma appellate public defender system and holding that under *Barker,* delay caused by late filing of appellate briefs due to an overworked public defenders' office cannot be attributed to defendants; noting that even mismanagement within the public defenders' office would not be an acceptable excuse for delay); *United States ex rel. Green v. Washington,* 917 F.Supp. 1238, 1274 (N.D.Ill.1996) ("[A]ny failure of First District—a state-funded indigent appellate defender agency—to brief petitioners' direct appeals in a timely manner cannot be attributed to the clients."); *Snyder v. Kelly,* 769 F.Supp. 108, 111 (W.D.N.Y.1991) (mem. & order) (finding that the "brobdingnagian case load of assigned counsel" did not provide an acceptable excuse for delay under the second *Barker* factor), *aff'd,* 972 F.2d 1328 (2d Cir. 1992); *United States v. Moreno,* 63 M.J. 129, 137 (C.A.A.F.2006) (where appellate defender requested numerous delays due to "other case load commitments," court declined to hold the defendant accountable for such delays, concluding that " '[o]ther case load commitments' logically reflects that [the defendant's] case was not getting counsel's professional attention, a fact that is the very antithesis of any benefit to [the defendant]").

{28} Finally, we reject the State's argument that time spent in plea negotiations cannot be counted against the state in a speedy trial analysis. In *Lujan*, 112 N.M. at 350, 815 P.2d at 646, we declined to apply a per se rule regarding time spent engaging in plea negotiations. We stated that assessing responsibility for such time was a factual endeavor to be performed by the trial court and, under the facts of that case, we held the time against the state. *Id.* Here, the State does not say what period of time can be attributed to plea negotiations, and the State has shown no reason why we should not defer to the trial court on this factual issue. Accordingly, we reject the State's argument. *See Mayeux v. Winder*, 2006–NMCA–028, ¶ 27, 139 N.M. 235, 131 P.3d 85 (noting that the appellant bears the burden of clearly demonstrating how the trial court erred).

{29} In sum, we acknowledge that part of the delay in this case is technically attributable to Defendant, because it was occasioned by his counsel pursuing or, more accurately, failing to pursue, the issue of his competency. However, as we have noted, the State bears some responsibility for the delay as well, due to the State's failure to monitor the case and ensure that steps were being taken to bring Defendant to trial in a timely manner. We agree with the district court that the State cannot be permitted to "sit on its hands" during extraordinary periods of delay, such as occurred in this case. We could weigh this factor neutrally because both parties were at fault, but we weigh this factor ultimately against the State because it is the State's responsibility to bring a defendant to trial.

### 3. Defendant's Assertion of the Right

{30} It is undisputed that Defendant did nothing to assert his right to a speedy trial until after the trial court had sua sponte dismissed the charges. Accordingly, we weigh this factor against Defendant. However, we are unwilling to put a great deal of weight on Defendant's failure to assert his right under the circumstances of this case. The district court acknowledged concern about the appearance that Defendant had acquiesced in the delay by failing to assert

his speedy trial rights. But the district court credited an expert report that stated that Defendant has the intellectual capacity of a twelve-year-old. The court questioned whether a twelve-year-old could even understand the concept of a speedy trial or of continuances. The court further noted that Defendant would have had a difficult time expressing his frustration at the delay because he was often not transported to court for hearings. We also note that, where defense counsel felt forced to continually delay the trial in part due to an unmanageable caseload, counsel was not in a position to make a speedy trial claim on Defendant's behalf.

{31} Our decision to give less weight to Defendant's failure to assert his speedy trial rights is also supported by the reasoning in *Barker* and the policy rationales that underlie this factor. In *Barker*, the Supreme Court specifically considered adopting the "demand-waiver" doctrine, which "provides that a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial." 407 U.S. at 525, 92 S.Ct. 2182. The Court declined to adopt that rule, deciding that it would be more appropriate to consider a defendant's assertion of the speedy trial right as only one factor among several, so that a court would be permitted to "exercise a judicial discretion based on the circumstances." *Id.* at 528–29, 92 S.Ct. 2182. Under this approach, the Court said, a situation where a defendant "knowingly fails to object" could be distinguished from a situation where an attorney "acquiesces in long delay without adequately informing his client." *Id.* at 529, 92 S.Ct. 2182. Nonetheless, the Court stated that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532, 92 S.Ct. 2182.

{32} The Supreme Court also articulated two policy considerations that inform the analysis of a defendant's assertion of the right. First, the Court implied that delay sometimes inures to a defendant's benefit, and thus a defendant should not be permitted to purposefully sit by during lengthy delays and then ambush the court and the

state with a claim that his or her speedy trial rights have been violated. Under the facts of *Barker*, for example, the Court determined that *"Barker* did not want a speedy trial." *Id.* at 534, 92 S.Ct. 2182. Rather, the Court stated—and the defendant's counsel had admitted—that the defendant had not asserted his rights because he was purposefully gambling on the possibility that an accomplice would be acquitted. *Id.* at 535-36, 92 S.Ct. 2182. Second, the Court stated that a defendant's assertion of the right was relevant because it was also an indicator of prejudice—a defendant would be less likely to sit by during lengthy delays if he or she was suffering due to the wait or genuinely thought that the delay would be harmful to his or her case. *See id.* at 531, 92 S.Ct. 2182 ("The more serious the deprivation, the more likely a defendant is to complain.").

{33} In view of these two policy concerns, it would not be fair to put great emphasis on Defendant's failure to assert his rights. Under the facts of this case, we surely cannot say, as the Court in *Barker* did, that Defendant "did not want a speedy trial." Like the district court, we question, in view of Defendant's diminished capacity, whether any significance can be attributed to his silence. Also unlike in *Barker*, the district court here made a specific finding that there was no tactical delay on the part of defense counsel. Finally, we decline to view Defendant's silence as an indicator that he did not mind being incarcerated for three and one-half years without a trial or that he did not think his defense would be prejudiced on the merits by the delay. Thus, while Defendant's failure to assert his right weighs against him, it does so only slightly.

### 4. Prejudice

■ {34} We examine the three types of prejudice that *Barker* held relevant to the speedy trial analysis: "(1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility of impairment to the defense." *Plouse*, 2003–NMCA–048, ¶ 51, 133 N.M. 495, 64 P.3d 522 (internal quotation marks and citation omitted).

■ {35} *Barker* identified the evils that can result from pretrial incarceration—loss of a job, disruption of family life, enforced idleness, and the inability to work on one's defense. 407 U.S. at 532–33, 92 S.Ct. 2182. In determining the significance of pretrial incarceration, "the question is whether the length of time was unacceptably long." *Laney*, 2003–NMCA–144, ¶ 29, 134 N.M. 648, 81 P.3d 591. Here, we have no difficulty concluding that three and one-half years in jail is unacceptably long and is thus oppressive. *Cf. Salandre v. State*, 111 N.M. 422, 430, 806 P.2d 562, 570 (1991) (holding that restraints on the defendant's liberty were not "oppressive" where he was under restrictions of bond for only about a month after being released from incarceration on other charges); *Marquez*, 2001–NMCA–062, ¶¶ 12, 24–29, 130 N.M. 651, 29 P.3d 1052 (addressing pretrial incarceration factor in the context of an eighteen-month delay and not being persuaded by the defendant's argument that the conditions of his release interfered with his employment, but nonetheless weighing the circumstances in the defendant's favor because "he lived under the restrictions for an unacceptably long period of time").

{36} The State argues that Defendant's incarceration was not oppressive because the record does not support Defendant's claims that he was harassed and assaulted in jail. We disagree. Defendant attached a number of documents to his reply in support of his motion to dismiss. These documents include a number of requests to stay in administrative segregation made by Defendant because he feared for his safety, and a number of incident reports indicating that Defendant was involved in physical altercations. The State supports its argument with the testimony of Defendant's attorneys who, for the most part, testified that they were unaware of Defendant having serious problems while incarcerated. However, the district court found otherwise, stating that Defendant "has been prejudiced—he's been prejudiced by numerous documented attacks at the jail." We defer to this finding. *See Laney*, 2003–NMCA–144, ¶ 10, 134 N.M. 648, 81 P.3d 591 ("[W]e [defer] to the district court's fact finding[.]" (second alteration in original) (internal quotation marks and citation omitted)). Moreover, the district court specifically noted

that one of the expert reports recommended that Defendant be housed at a mental health facility, rather than in jail, due to the danger that he would decompensate. This further supports Defendant's assertion that his lengthy pretrial incarceration was oppressive. Accordingly, we weigh this factor in Defendant's favor.

{37} We next examine any anxiety and concern that Defendant may have suffered as a result of being in jail and having charges pending against him for an extended period. Defendant does not appear to have specifically alleged undue anxiety and concern, and one of his attorneys who visited him in jail testified that he appeared "happy as a clam." We do note the district court's speculation that perhaps Defendant's happy appearance was a result of his diminished mental capacity. Nonetheless, we agree that Defendant did not appear to suffer undue anxiety and concern that should be weighed in his favor.

{38} Finally, we examine whether the delay impaired Defendant's ability to mount a defense. Of the three types of prejudice considered in the speedy trial analysis, this type is "the most serious ... because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. As the length of delay increases, the presumption of prejudice grows stronger and the degree of actual prejudice that must be shown becomes correspondingly lesser. *Salandre*, 111 N.M. at 429, 806 P.2d at 569; *see also Work*, 111 N.M. at 148, 803 P.2d at 237 ("On the question of prejudice, the delay may be so lengthy that the presumption of prejudice becomes well-nigh conclusive and proof of actual prejudice is unnecessary."); *Doggett*, 505 U.S. at 656, 112 S.Ct. 2686 (noting that while "presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay" (citation omitted)).

{39} In *Salandre*, 111 N.M. at 428–431, 806 P.2d at 568–71, our Supreme Court elaborated on the method by which impairment of the defense should be addressed. The Court held that the state bears the ultimate burden of showing a lack of impairment and that, where the defendant has raised specific claims of impairment, it is up to the state to rebut those claims. *Id.* at 429 & n. 5, 806 P.2d at 569 & n. 5. In *Salandre*, the defendant wanted to show that his traffic stop was unjustified because the motorcycle he was riding did not have defective equipment. *Id.* at 431, 806 P.2d at 571. However, during the pretrial delay, the motorcycle had been destroyed through no fault of the State. *Id.* at 424, 806 P.2d at 564. The state argued that there was no impairment of the defense because the condition of the motorcycle could be proved by business records from the shop where the defendant had purchased the motorcycle. *Id.* at 429 n. 5, 806 P.2d at 569 n. 5. The Court held that the state's mere speculation was insufficient to rebut the defendant's allegation. *Id.* at 429 n. 5, 431, 806 P.2d at 569 n. 5, 571. The Court indicated that the state would have had to actually introduce the business records or, at the very least, prove that they were still available. *Id.* at 431, 806 P.2d at 571.

{40} At the evidentiary hearing in this case, defense counsel argued that the passage of time could make it very difficult to ascertain what really happened in this case. Counsel stated, "We have five years of therapy, which is good for the alleged victim, but in terms of trying to find the truth, where are we going to find the truth after that many years." The trial court was apparently persuaded by this argument, noting that five years had passed and "nobody [presumably no one from the public defender department] has even interviewed the victim." The State's only response to this argument is as follows:

> At the hearing on Defendant's motion to dismiss, the State eliminated any possibility that the defense was impaired by the delay. Defendant was charged with [numerous sex offenses]. The prosecutor informed the [c]ourt that all the witnesses, including the victim ... are still available to testify at trial. Thus there was no real danger that "witnesses may become unavailable or their memories may fade." *Barker*, 407 U.S. at 521, 92 S.Ct. 2182.

{41} We think Defendant's allegation of prejudice regarding the memory of the alleged victim is only moderately persuasive because it is somewhat speculative. On the one hand, Defendant's allegation is not as speculative as, say, a general allegation that due to the passage of time, witnesses may be difficult to find or their memories may have faded. *See People v. Gilmore,* 222 Mich.App. 442, 564 N.W.2d 158, 168 (1997) (holding that "general allegations" that "delay causes witnesses' memories to fade" are insufficient). On the other hand, Defendant's allegation is fairly general and is not supported by any corroborating evidence. *See Zurla v. State,* 109 N.M. 640, 647, 789 P.2d 588, 595 (1990) ("[E]ven when the state does not carry completely its burden of persuasion to show an absence of prejudice, the extent to which the defendant can be said to have prevailed on this issue lessens substantially in the absence of corroborating evidence.").

{42} On balance, however, we think that Defendant's allegation demonstrates enough specificity to make it somewhat persuasive. Defendant did not just make a general argument that time causes memory loss. Rather, he pointed out that the memory of a child victim is particularly susceptible to the passage of time and that this victim had been in therapy for five years. We find these contentions persuasive in the overall context of this case. *Cf. In re Benjamin L.,* 92 N.Y.2d 660, 685 N.Y.S.2d 400, 708 N.E.2d 156, 161 (1999) (noting that delay can be particularly prejudicial for juvenile offenders because "[a] juvenile, experiencing the vicissitudes of childhood and adolescence, is more likely to suffer from a lack of memory than an adult" (citing 2 Fitzgerald, *Encyclopedia of Adolescence: Memory* 629 (Lerner et al. eds., 1991))).

{43} We agree with Defendant that to the extent he succeeded in asserting cognizable prejudice, the State did not carry its burden of rebutting his assertions. As our Supreme Court held in *Salandre,* for the State to properly rebut a specific·allegation of prejudice, it is not enough to merely *argue* that the defendant's assertions are not a matter of concern. 111 N.M. at 429 n. 5, 806 P.2d at 569 n. 5. Rather, the state must come forward with something concrete to rebut the allegations. *Id.* Indeed, in a footnote, the Court specifically addressed the issue of witness memory, when it noted that the state could show "that likely defense witnesses do not report any significant impairment of their memory." *Id.* Here, the State could have shown, for example, that the alleged victim had been interviewed more recently and that her statement regarding the events in question had not changed. Instead, the State chose not to present any specific evidence or arguments with regard to the child victim's memory and merely made a conclusory assertion that the witnesses were still available and that there had been no memory loss. We agree with Defendant that such speculation on the State's part was not sufficient to rebut his specific allegation of prejudice with regard to the alleged victim.

{44} In sum, we hold that the prejudice factor weighs moderately in Defendant's favor. First, he suffered oppressive pretrial incarceration that lasted for an unacceptably long time. *See Laney,* 2003–NMCA–144, ¶ 29, 134 N.M. 648, 81 P.3d 591. Second, he demonstrated some prejudice to his defense, which the State was not successful in rebutting. While we have noted that Defendant's assertions of prejudice to his defense are only mildly persuasive, we still weigh the prejudice factor in Defendant's favor overall because of the extreme length of the delay. *See Work,* 111 N.M. at 148, 803 P.2d at 237 ("On the question of prejudice, the delay may be so lengthy that the presumption of prejudice becomes well-nigh conclusive and proof of actual prejudice is unnecessary."); *Doggett,* 505 U.S. at 652, 112 S.Ct. 2686 ("[T]he presumption that pretrial delay has prejudiced the accused intensifies over time.").

## 5. Balancing the Factors

{45} We have held that Defendant's failure to timely assert his rights weighs slightly against him, and that the other three factors weigh in his favor. We are mindful of the fact that the speedy trial analysis is not "mechanical" and must take into account all the relevant circumstances. *Lujan,* 2003–NMCA–087, ¶ 29, 134 N.M. 24, 71 P.3d 1286. Here, the unacceptably long

period during which Defendant was incarcerated weighs heavily in his favor. *See Barker,* 407 U.S. at 532, 92 S.Ct. 2182 (noting that actual incarceration is "obviously ... more serious" than other restraints on liberty). Balancing the factors as a whole, we conclude that Defendant's right to a speedy trial was violated and that the trial court properly dismissed the charges. *See Salandre,* 111 N.M. at 425, 431, 806 P.2d at 565, 571 (concluding that it was a "close case" but that the defendant's speedy trial rights were violated where the prejudice was slight and the other three factors weighed in his favor "but not heavily"); *State v. Johnson,* 113 N.M. 192, 193–94, 824 P.2d 332, 333–34 (Ct.App.1991) (holding that the defendant's speedy trial rights were violated where the first three factors weighed in the defendant's favor "but not heavily" and the prejudice suffered did not include impairment of the defense). Here, as in *Talamante,* we conclude that "the State demonstrated an 'unacceptable indifference' to its constitutional duty of bringing this case to trial within a reasonable time." 2003–NMCA–135, ¶ 14, 134 N.M. 539, 80 P.3d 476 (quoting *Zurla,* 109 N.M. at 643, 789 P.2d at 591).

## CONCLUSION

{46} We affirm the trial court's order dismissing the charges against Defendant.

{47} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and CYNTHIA A. FRY, Judges.